**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THE J. M. SMUCKER COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **PAUL-YVANN DJAMEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THE J. M. SMUCKER COMPANY'S VERIFIED COMPLAINT**
**FOR INJUNCTIVE RELIEF AND DAMAGES**

**COMES NOW** Plaintiff, The J. M. Smucker Company ("Smucker"), by and through its attorneys, for its Complaint against Defendant, Paul-Yvann Djamen (aka Yvann Paulin Djamen Tchana) ("Defendant"), states and alleges as follows:

**INTRODUCTION**

1.      Smucker brings this action to recover damages and obtain injunctive relief following its discovery that a Senior Scientist formerly employed by Smucker improperly copied, transferred, and retained Smucker's confidential and proprietary information and trade secrets from Smucker's computer laptops and systems and now, refuses to return and destroy the confidential and proprietary information and trade secrets he stole. Instead, Defendant continues to possess Smucker's trade secrets, creating a risk that Smucker's trade secrets may assist a competitor in developing products that could directly compete with Smucker's industry-leading products. In so doing, Defendant is violating the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"); the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 *et seq.*

("OUTSA"); the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and other state law. By engaging in this misconduct, the former employee also has breached contractual obligations under confidentiality agreements and violated fiduciary duties owed to Smucker.

2.      Smucker manufactures and sells food and beverage products that are widely recognized for their high quality and consumer appeal. Smucker's products are distributed throughout the United States and internationally, and Smucker maintains a reputation for excellence in the food and beverage industry.

3.      Smucker has spent years and millions of dollars developing its confidential information and proprietary methods, procedures, and techniques needed to create its products, including its coffee, pet foods and snacks, and handhelds offerings such as its renowned Uncrustables® branded products.

4.      Smucker hired Defendant as a Senior Scientist to help improve Smucker's food product methods and protocols, including Uncrustables® branded products.

5.      After approximately one year of employment with Smucker, Defendant was placed on a performance improvement plan and given the opportunity to address deficiencies. His employment was ultimately terminated in September 2025 due to ongoing unsatisfactory performance.

6.      Upon Defendant's termination, Smucker promptly reminded him of his confidentiality and non-disclosure obligations and requested the immediate return of all data and materials Defendant obtained during his employment, including three Smucker-issued computer laptops.

2

7.     Despite multiple subsequent written requests to return Smucker's computer laptops, Defendant did not promptly return Smucker's computer laptops. Over a month after Defendant's termination, he returned only two of the three Smucker-issued computer laptops.

8.     Consistent with Smucker's established post-termination procedures, Smucker initiated a thorough examination of the computer laptops that Defendant had returned, which examination was undertaken to safeguard Smucker's confidential and proprietary information and trade secrets. What Smucker discovered through this investigation is alarming—Defendant had copied, transferred, and downloaded ***hundreds*** of confidential and sensitive files to external USB storage drives.

9.     Of even greater concern, Smucker discovered that, prior to his departure, Defendant forwarded 1,955 emails from his Smucker email account to his personal email account. These findings indicate Defendant's deliberate actions to retain and exploit Smucker's confidential and proprietary information.

10.     Despite multiple written demands from Smucker for the return of all computer laptops and the destruction of all confidential and proprietary information and trade secrets in his possession, Defendant has not fully complied.

11.     Though Defendant returned the third computer laptop on January 21, 2026, Defendant has admitted he still has hundreds of confidential and sensitive files on external USB drives. Defendant has also retained 1,955 emails. As a result, Smucker's valuable confidential and proprietary information and trade secrets continue to be at risk of unauthorized disclosure or misuse.

## PARTIES

12.     Smucker is a corporation organized and existing under the laws of the State of Ohio with a principal place of business at 1 Strawberry Lane, Orrville, Ohio 44667.

13.     Defendant is an individual residing in Akron, Ohio. Upon information and belief, Defendant is a citizen of Ohio. Defendant is a former employee of Smucker, where he served as a Senior Scientist within the Research & Development Department ("R&D") across various strategic business areas ("SBAs") but primarily focusing on frozen and handheld foods and spreads ("Handheld SBA"); he also spent time consulting on U.S. Retail Pet Foods ("Pet SBA") and U.S. Retail Coffee ("Coffee SBA") (collectively, the "SBAs").

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Smucker's cause of action under the DTSA, 18 U.S.C. § 1836 (b)(1) presents a federal question.

15.     This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). The state claims asserted are intimately related to the DTSA claim, are built on the same factual predicate, and are part of the same case or controversy.

16.     This Court has personal jurisdiction over Defendant because Defendant worked in the State of Ohio, performed material portions of his job duties in the State of Ohio, and upon information and belief, resides in the State of Ohio.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant resides in this District and a substantial part of the events giving rise to Smucker's claims occurred in this District, including but not limited to actions constituting misappropriation of Smucker's trade secrets.

## FACTUAL BACKGROUND

18.     For over a century, Smucker's brand and products have been helping to make meals and snacks more delicious. Smucker is proud to make great tasting, convenient, and responsibly produced food. For more than 125 years, Smucker has maintained a commitment to meeting the highest standards of quality for its products. As a result, the general public has come to associate high-quality goods with Smucker.

19.     Tracing its roots to 1897 in Ohio, Smucker produces and markets a wide range of food and beverage products, including coffee, frozen foods, pet foods and snacks, baked goods and related products, handhelds offerings such as peanut butter and jelly sandwiches, as well as fruit-based products such as peanut butter, jams, jellies, and spreads.

20.     In its fifth generation of family stewardship, Smucker is proud to offer products that consumers trust for themselves and their families every day. Today, approximately 90 percent of U.S. households have a product from the Smucker portfolio.

### *Smucker's Confidential Information is Valuable*

21.     The primary SBA in Smucker's portfolio from which Defendant stole and misappropriated Smucker's confidential and proprietary information and trade secrets is the Handheld SBA. Defendant may have also misappropriated confidential information gained from his work in the Pet and Coffee SBAs.

22.     *Handheld SBA*. Among the diverse offerings in its Handheld SBA is one of Smucker's most iconic brands and products—Uncrustables®—introduced in 1996. Uncrustables® branded products include ready-to-eat, crustless handheld sandwiches that combine great taste with ultimate convenience. Designed for busy families and on-the-go lifestyles, these frozen handheld sandwiches require no preparation—just thaw and enjoy. Available in a variety of flavors,

Uncrustables® branded products have become a staple in households nationwide and a leader in the handheld snack category.

23.     An Uncrustables® handheld sandwich is also unique because of its round design, with distinct peripheral undulated crimping that Smucker created after years of research and testing.

24.     A peanut butter and jelly sandwich may seem simple, but achieving the Smucker standard is no "spread-and-go" task. It requires specialized scientific and technical expertise, along with confidential and proprietary information that Smucker has developed and safeguarded over decades. From precise bread proofing, oven temperatures, cooling processes, depositing techniques, and filling ratios to the confidential manufacturing processes and equipment configurations, this confidential and proprietary information and trade secrets ensure consistent quality, safety, and the distinctive characteristics that define Smucker's Uncrustables® handheld sandwiches.

25.     For instance, bread proofing is an essential factor in meeting Smucker's standards, creating the perfect balance between the bread and its flavorful fillings.

26.     Bread proof refers to the degree of rise the dough achieves during the proofing stage—the final fermentation period after shaping and before baking. During bread proofing, yeast ferments sugars in the dough, releasing carbon dioxide, which gets trapped in the gluten network. This causes the dough to expand and become airy. The "proof height" is essentially how much the dough has risen compared to its original size, often doubling or nearly doubling in volume.

27.     Proper proof height ensures the bread has an open, soft crumb rather than a dense, tight texture. This is critical for sandwich bread, which needs to be light yet sturdy enough to hold fillings without collapsing.

6

28.     Adequate bread proofing allows yeast fermentation to develop complex flavors and aromas, improving the overall eating quality of the sandwich.

29.     If under-proofed, the bread will bake into a squat, dense loaf; if over-proofed, it may collapse or have irregular holes. Correct proof height gives a uniform shape ideal for slicing into sandwich portions.

30.     Through years of dedicated research and innovation, Smucker's has mastered the art of crafting Uncrustables® handheld sandwiches, transforming a simple sandwich into a beloved staple. This process ensures every Uncrustables® handheld sandwich delivers consistent quality, convenience, and taste.

31.     Because of the substantial demand and popularity, Uncrustables® handheld sandwiches come in multiple flavors and varieties, including: (1) the Uncrustables® Peanut Butter & Grape Jelly Sandwich; (2) the Uncrustables® Peanut Butter & Strawberry Jam Sandwich; (3) the Uncrustables® Peanut Butter & Raspberry Spread Sandwich; (4) the limited edition Uncrustables® Berry Burst Peanut Butter & Mixed Berry Spread Sandwich; (5) the limited edition Uncrustables® PB Choco Craze Peanut Butter & Chocolate Flavored Hazelnut Spread Sandwich; (6) the new Uncrustables® Up & Apple Peanut Butter & Apple Cinnamon Jelly Sandwich; (7) the new Uncrustables® Bright-Eyed Berry Peanut Butter & Strawberry Jam Sandwich; (8) the Uncrustables® Chocolate Flavored Hazelnut Spread Sandwich; (9) the Uncrustables® Peanut Butter & Honey Spread Sandwich; (10) the Uncrustables® Peanut Butter Sandwich; (11) the Uncrustables® Reduced Sugar Peanut Butter & Grape Spread Sandwich on Wheat; and (12) the Uncrustables® Reduced Sugar Peanut Butter & Strawberry Spread Sandwich on Wheat.

32.     For at least the last 20 years, Smucker has invested over a billion dollars to develop and safeguard Uncrustables® branded products, including its confidential and proprietary

information and trade secrets. These investments include safeguarding the processes surrounding the unique design and manufacturing methods for its round, crustless sandwiches with the pie-like shape and distinct peripheral undulated crimping as noted above.

33.    Smucker's confidential and proprietary information and trade secrets encompass specialized techniques, formulations, equipment, and production innovations that are not publicly known and provide Smucker with a significant competitive advantage.

34.    Smucker continues to develop innovative methods to introduce new flavors to consumers, developing these varieties over time through substantial research and development efforts as well as considerable investment; Smucker is dedicated to consistently enhancing its quality standards and remains committed to creating new flavors in the future.

35.    Smucker's Uncrustables® sandwiches are sold in thousands of retail stores across the country. Smucker devotes a significant amount of time, energy and resources toward protecting the value of its Uncrustables® branded products and its efforts have yielded great rewards.

36.    As a direct result of significant time and investment, Smucker's Uncrustables® branded products have grown over the past 20 years, and sales associated with Uncrustables® branded products are fast on the way to reaching $1 billion dollars. Smucker produces approximately 1.5 billion Uncrustables® sandwiches annually at three manufacturing facilities in Kentucky, Colorado (opened in 2019), and Alabama (opened in 2024). Uncrustables® sandwiches are recognized and enjoyed everywhere from school cafeterias to the National Football League.[1]

37.    _Pet SBA_. Over the years, Smucker has made strategic investments to provide families with top-quality pet products. Smucker's features trusted brands to meet the nutritional

---

[1] _See_ Jayson Jenks, _Wait, NFL players eat how many Uncrustables?_, N.Y. TIMES (Oct. 24, 2024), https://www.nytimes.com/athletic/5854102/2024/10/24/uncrustables-nfl/.

needs of pets and the preferences of their pet parents, including Milk-Bone® dog snacks and Meow Mix® cat food.

38.     Smucker's dedicated animal nutritionists collaborate with Smucker's food scientists to carefully select ingredients and craft proprietary recipes. Every aspect—nutrition, taste, texture—is considered to ensure optimal health and enjoyment for pets. In addition, Smucker employs licensed veterinarians to uphold rigorous standards for safety and quality and to analyze product performance.

39.     This work involves Smucker developing and accumulating valuable confidential and proprietary information and trade secrets in the Pet SBA, including specialized formulations, ingredient sourcing strategies, and testing protocols, all of which are protected and safeguarded to maintain Smucker's competitive advantage.

40.     Smucker's Pet SBA represented Smucker's highest quarterly sales in 2023.[2] And despite Smucker's divestiture of several pet food brands in 2023, the Pet SBA still continues to play a central role in the company's overall performance.

41.     *Coffee SBA*. More Americans start their day with a cup of coffee at home from a Smucker coffee brand than any other company. Through investments and strategic partnerships, Smucker has percolated innovation throughout the coffee industry, establishing itself as a leader in advancing coffee products and experiences. Smucker offers products to meet consumers evolving taste preferences such as darker, premium roasts; and convenience needs, including one-cup and ready-to-drink solutions.

42.     Smucker's Coffee SBA relies on confidential and proprietary information and trade secrets such as roast and blending formulas and recipes; time-temperature, roast curves, extraction

---

[2] *See* https://globalpetindustry.com/news/pet-food-makes-most-jm-smuckers-quarterly-sales/

ratios; moisture and grind calibration techniques; bean sourcing; pricing arrangements, models and data; marketing performance and commercial strategy and data. These facets give Smucker a competitive edge in the marketplace.

43. In 2023, Smucker's Coffee SBA represents 26% of the U.S. at-home coffee market, with its coffee business valued at $2.5 billion.[3]

## *Scope of Smucker's Confidential Information*

44. Smucker owns confidential and proprietary information and trade secrets across products with which Defendant was involved—Handheld SBA, Pet SBA, and the Coffee SBA.

45. Regarding its Handheld SBA, Smucker owns confidential and proprietary information and trade secrets that include: (A) unique ingredient compositions and ratios; (B) specialized preparation and assembly methods; (C) proprietary temperature controls; (D) exclusive supplier relationships; (E) shelf-life stabilization techniques; (F) nutritional formulation engineering; (G) batch-scaling specifications; (H) internal quality-control protocols; (I) manufacturing workflows; (J) pricing models; (K) supplier identities; (L) customer data and analytics; (M) vendors lists; and (N) packaging methods to ensure product quality and consistency ("Handheld Confidential Information").

46. Housed in Smucker's Handheld SBA, Smucker owns confidential and proprietary information and trade secrets related to its Uncrustables® branded products. Smucker has developed and owns confidential information regarding: (A) ingredient compositions and ratios for all sauces, spreads, marinades, and seasoning blends; (B) preparation methods, cooking sequences, marination times, and temperature controls, (i.e., bread proof height); (C) assembly

---

[3] Megan Poinski, How Smucker's Coffee Brands Keep Sales and Innovation Percolating. FOOD DIVE (May 17, 2023), https://www.fooddive.com/news/smucker-coffee-joe-stanziano-qa-1/650270/

sequencing, including proprietary layering techniques affecting flavor profile and shelf life; (D) customized equipment and equipment components; (E) supplier-specific ingredient sourcing, including vendor identities, proprietary blends, and pricing terms; (F) shelf-life stabilization techniques, including moisture retention and packaging parameters; (G) nutritional formulation engineering to meet calorie, protein, and preservative-free targets; (H) scaling specifications for batch production, quality-control tolerances, and yield standards ("Uncrustables® Brand Confidential Information").

47.     Handheld Confidential Information and Uncrustables® Brand Confidential Information include confidential and proprietary information and trade secrets such as Smucker's Flow Meter Data[4]; Model Validation Data[5]; Specification Examples[6]; Basic Data Systems at Plant for Uncrustables®. Defendant's principal responsibilities were concentrated within the Handheld SBA with particular focus on Uncrustables®.

---

[4] In the food industry, flow meter data includes monitoring liquids such as water, milk, oils, and sauces that are transported, mixed, and processed during production as well as monitoring gases like carbon dioxide. Essentially, flow meters ensure consistency and efficiency in every batch. This confidential and proprietary information and trade secret allow Smucker to bake perfection into its products.

[5] Model validation is the process of evaluating a predictive model, using a mathematical framework or algorithm that forecasts future outcomes based on historical data. In the bakery context, this means that Smucker collects data on temperatures to eliminate pathogens like *Salmonella*; water activity and humidity are closely monitored to control microbial growth and maintain optimal texture; mathematical predictive models are applied to forecast spoilage, such as mold development, and estimate shelf-life under diverse conditions; and comprehensive data is collected on texture, color, crispness, and internal moisture to verify that finished products consistently meet established quality specifications.

[6] A product specification is a detailed document that outlines the necessary standards, ingredients, and quality parameters for a food product. In food manufacturing, comprehensive specifications act as blueprints for everyone from production teams to ingredient suppliers to understand the exact requirements. Specifications can cover everything from physical characteristics to chemical properties, ensuring product consistency and compliance with regulatory standards.

48.     Regarding its Pet SBA, Smucker owns confidential and proprietary information and trade secrets that include: (A) original recipes and ingredient ratios; (B) product specifications; (C) advanced nutritional engineering and processing techniques; (D) quality assurance protocols; (E) supplier identities; (F) exclusive pricing arrangements; (G) customer data and analytics, (H) supplier identities; (I) customer lists; (J) vendors lists; (K) specialized marketing analytics; and (L) data, analytics, and strategies for new product development, all of which are essential to maintaining product safety and market differentiation ("Pet Confidential Information").

49.     With respect to Smucker's Coffee SBA, Smucker's confidential and proprietary information and trade secrets encompass: (A) proprietary roast and blending formulas such as Signature Flavor Profiles; (B) precise time-temperature roast curves; (C) extraction ratios; (D) unique green-bean sourcing knowledge; (E) internal quality-control protocols; (F) manufacturing workflows; (G) pricing models; (H) supplier identities; (I) customer data and analytics; (J) vendors lists; and (K) specialized marketing analytics ("Coffee Confidential Information").

50.     As defined above, Smucker's Coffee Confidential Information, Pet Confidential Information, Handheld Confidential Information, and Uncrustables® Brand Confidential Information (collectively, "Confidential Information") are valuable.

51.     Because there are so many possible combinations of the different specific ingredients within the broad classes of ingredients and the mixing protocols across the SBAs, Smucker accumulated this Confidential Information regarding how to narrow down the myriad of options of ingredients, processes, and techniques most likely to work properly in a specific combination, which is highly valuable.

52.     Smucker's Confidential Information is not known to the public and cannot be reverse-engineered from the finished product, which provides Smucker with a substantial competitive advantage.

53.     Smucker's Confidential Information greatly reduces the number of trial-and-error cycles required to identify a taste and flavor profile that appeals to its consumers. Moreover, each of these trial-and-error cycles is time-consuming and expensive.

54.     Each and every facet of Smucker's Confidential Information would be useful to someone seeking to create a successful product in any one of these SBAs.

55.     Thus, these facets of Smucker's Confidential Information provide an economic advantage because this information has remained secret due to the reasonable protections that Smucker has put in place to protect it.

56.     As a result of Defendant's misappropriation, Smucker's Handheld SBA, Pet SBA, and Coffee SBA now face significant risks.

### *Smucker Has Reasonably Protected Its Confidential Information and Trade Secrets*

57.     Smucker has reasonably protected its Confidential Information. In general, Smucker has undertaken a variety of efforts to limit knowledge of its Confidential Information, especially with respect to product specifications and formulations to a limited group of employees that need to know that confidential information in the performance of their roles at Smucker. Defendant was in that limited group of employees.

58.     Smucker employs at least three methods of protecting its Confidential Information: (1) physical barriers, (2) Smucker's internal proprietary servers and systems ("Computer Systems"), and (3) employee agreements and training.

59.     *Physical Barriers*. Smucker maintains control over who enters or otherwise has access to its facilities.

60.     Certain buildings and plant facilities on Smucker's campus are highly restricted and only accessible to pre-screened and pre-approved employees. Such employees must be approved for a special badge in order to enter and exit those buildings and facilities.

61.     One such building is the Odyssey Product Research Lab ("PRL"). This building is dedicated to research and development of Smucker's SBAs.

62.     Only R&D employees have access to PRL. An employee needs pre-approval and is assigned a key card in order to enter the building. The PRL is kept locked with only a limited group of Smucker personnel on R&D and a cleaning crew having access. The limited group of Smucker personnel are members of the R&D team, the director of operations, the production manager, food safety professional, and the environmental & safety manager. As for the cleaning crew, Smucker requires all research & development materials and notebooks to be secured overnight in locked drawers, file cabinets or in offices not accessible to the cleaning crew. Additionally, even more specific badge access is required to enter the lab areas of the PRL.

63.     Third-party visitors to the manufacturing facilities are infrequent. To the extent there are visitors, they are bound by non-disclosure agreements with Smucker. Notwithstanding these agreements, all third-party visitors must sign in. Visitors are not allowed access to the manufacturing floor to maintain both safety and confidentiality and are not given access to the Odyssey building.

64.     Because of his role, Defendant had access to the PRL building where Smucker kept its Confidential Information.

65.     *Smucker's Computer Systems*. Smucker maintains a comprehensive and robust network of Computer Systems to safeguard its Confidential Information. Each SBA—including the Handheld SBA, Coffee SBA, and Pet SBA—is supported by its own dedicated proprietary programs, namely SharePoint, Prodika, and Proficy.

66.     Confidential Information is siloed so that only authorized R&D personnel can access data relevant to their assignments.

67.     The Handheld SBA maintained its own SharePoint, Prodika, and Proficy systems, all of which housed Confidential Information. Every system or SharePoint folder was either password-protected or involved single sign-on and required multi-factor authentication, so R&D personnel required special approval to access these documents.

68.     Similarly, both the Coffee SBA and Pet SBA maintained separate SharePoint, Prodika, and Proficy systems that contained Confidential Information. Each assignment and project were protected by passwords or single sign-on and multi-factor authentication, so R&D personnel needed special approval to access them.

69.     Access to these Computer Systems is governed by a stringent approval process. Employees wishing to access a particular SBA's file must first obtain special authorization, which is reviewed and granted based on their role and project involvement. Once granted, employees are promptly informed of the confidential nature of the data they are permitted to view and reminded of their obligations to maintain strict confidentiality.

70.     Importantly, not all R&D employees have universal access to all files, folders, or product data containing Confidential Information. For example, an employee focused on peanut butter development within the Handheld SBA may not be able to view or retrieve documentation related to Uncrustables® or products outside their scope. Each SBA's digital environment operates

with customized permissions, reinforced by either single sign-on (which requires multi-factor authentication) or password protections at both the system and document levels.

71.     Through this multi-layered system of segregated platforms, strict approval processes, and password protections, Smucker ensures that Confidential Information remains safely contained within its intended SBA and securely out of reach of unauthorized individuals or third parties.

72.     *Employee Agreements and Training*. All Smucker employees agree to maintain the secrecy of Smucker's Confidential Information for the sole benefit of Smucker by executing a Non-Disclosure and Invention Assignment Agreement and by agreeing to the Employee Handbook.

73.     Employees were often reminded through onboardings, department meetings, and kick-off meetings to safeguard Smucker's Confidential Information.

74.     Smucker agreements with suppliers include provisions requiring that product specifications be kept confidential.

75.     Smucker requires third parties with whom it works or contracts (e.g. suppliers, transport carriers, engineers, subcontractors, etc.) to sign confidentiality agreements requiring such third parties to maintain the confidentiality of Smucker's Confidential Information to the extent it receives them. Oftentimes there is also the confidentiality clause in the service or supplier contracts.

76.     Accordingly, Smucker implemented rigorous measures to protect Confidential Information underlying its SBAs, including its Uncrustables® branded products because the manufacturing plants where these processes were developed and applied only permitted access to approved employees who were required to sign confidentiality and non-disclosure agreements, and

entry into certain areas of the facility where products such as Uncrustables® handheld sandwiches were produced required special authorization, ensuring that the methods, equipment configurations, and production techniques remained strictly confidential and inaccessible to unauthorized personnel.

### *Defendant Agreed to Protect Smucker's Confidential Information and Trade Secrets*

77.     Smucker offered employment to Defendant on April 12, 2024.  In the offer, Defendant would work as a Senior Scientist across Smucker's Research & Development division and across various SBAs but specifically its Handheld SBA, Pet SBA, and Coffee SBA.

78.     Defendant accepted Smucker's offer and began his employment with Smucker on April 16, 2024.

79.     In his role as a Senior Scientist, Defendant engaged in hands-on product improvement initiatives. He actively participated in testing and refining products, including the development and experimental testing of new food products across various SBAs within a specialized facility and Smucker's famous and Uncrustables® branded products.

80.     As a member of Smucker's Research and Development Team, Defendant actively worked on optimizing baking and related processes while also creating and testing innovative new flavors for Uncrustables® brand handheld sandwiches. In fact, Defendant routinely managed and handled Handheld Confidential Information because he spent the bulk of his time on projects in the Handheld SBA. As such, Defendant was exposed to highly sensitive information and Smucker's Confidential Information.

81.     Because of Defendant's education and training in Data Science, his responsibilities also centered on designing and validating models to detect and address potential product and process issues prior to manufacture and market release. In this capacity, his work focused on

predictive modeling and troubleshooting to ensure the high quality and integrity that Smucker demands for its SBAs, particularly its Uncrustables® branded products. For example, Defendant manufacturing data to determine process parameters that highly impact the ability to consistently deliver the ideal bread. His efforts directly supported Smucker's commitment to maintaining rigorous quality standards across its diverse SBAs.

82. Defendant served as Data Scientist across various Research and Development divisions at Smucker. In this research-oriented role, Defendant provided process engineering support for manufacturing operations. His expertise was recognized across the organization, resulting in frequent assignments to different SBAs to address specific technical challenges and enhance operational efficiency. Defendant had access to Confidential Information across multiple R&D divisions.

83. Given the sensitive nature of the position, trust was paramount and was memorialized in the Non-Disclosure and Invention Assignment Agreement (the "NDA&I Agreement") that Defendant signed before he began his employment with Smucker. A true and accurate copy is attached as Exhibit A.

84. Under the NDA&I Agreement, Defendant agreed to protect Smucker's "Confidential Information," meaning "non-public information about the Company or one of its business partners concerning its or their products, technology, business transactions, finances, operations, personnel, or customers. Examples of Confidential Information include, but is not limited to, the following: current and future innovation and new product development, trade secrets, … material non-public information (MNPI)." *See id.*

85. Specifically, Defendant agreed that he would "hold the Confidential Information received in strict confidence and will exercise a reasonable degree of care to prevent disclosure to

others;" "not disclose or divulge either directly or indirectly the Confidential Information to unauthorized parties;" "not reproduce the Confidential Information nor use this information commercially or for any purpose other than the performance of Employee's duties;" and that he would "upon request or upon termination of [his] relationship with the Company, deliver to the Company any Confidential Information received from the Company or originating from employment with the Company." *See id*.

86.     Defendant also agreed that all designs, ideas, innovations, inventions, or improvements relating to either present or contemplated machines, products, methods of manufacture, or any other matters of a proprietary nature that he conceived during his employment with Smucker belong to Smucker. *See id*.

87.     Furthermore, the Salaried Employee Handbook reiterates that "employees may have access to information such as trade secrets, product specifications, systems, employment records, and financial data, as well as new product innovations and ideas" and that all such "information is confidential during the course of employment and after separation." A true and accurate copy is attached as Exhibit B. *See* Ex. B, p. 26. The Employee Handbook also makes it clear that "all Smucker-issued equipment must be returned upon exiting Smucker or terminating services with Smucker as outlined in the Acknowledgment of Receipt, Use and Return of Smucker Equipment and Records." *See id*., p. 20.

88.     Throughout his employment with Smucker, Defendant was entrusted with access to Smucker's Confidential Information, as well as Smucker's internal proprietary servers and systems ("Computer Systems"), as well as Smucker-owned equipment, including three computer laptops ("Computer Laptops") (collectively, "Computer Systems and Laptops"), to carry out his

job responsibilities. Many of these systems are password-protected or only accessible to employees with specific clearances.

89.     Because the Defendant worked across the various SBAs, he gained special access to Smucker's Computer Systems. Due to his role in Data Science, he was permitted to install specialized software on his laptops—software that was not available to other R&D team members.

90.     Defendant had access to information that, if obtained by a competitor, would grant that competitor a significant advantage. For example, Defendant had access to Smucker's innovation roadmap, technical and pricing data, process specifications, plant data and layout, and equipment schematics.

91.     Additionally, Smucker provided its employees, including Defendant, with confidential and proprietary guides and tools that outlined Smucker's proven methodologies for success. These resources enabled Smucker to prosper, resulting in continued government task order awards and opportunities for employee growth and development.

92.     The unauthorized disclosure of this information to a competitor would enable them to capitalize on Smucker's strategic efforts without incurring the significant costs and investments made by Smucker.

93.     If a competitor were to obtain these materials, Smucker would lose the distinct advantage gained through its own achievements.

### *Defendant Placed on Performance Improvement Plan and Subsequently Terminated for Continued Performance Deficiencies*

94.     Beginning in February 2025, Defendant's performance declined. Defendant failed to complete assigned work in a timely and accurate manner, engage in clear and concise communication, incorporate feedback from stakeholders into presentations, and translate theories into actionable tasks for his team.

95.     Defendant's performance deficiencies were documented by management and communicated to him verbally and in writing. As a result, he received a "2" out of "5" rating on his fiscal year 2025 year-end review.

96.     On July 16, 2025, Smucker formally placed Defendant on a 90-Day Performance Improvement Plan ("PIP") to notify him of the severity of the continuing performance concerns and provide him with a reasonable opportunity to improve. This came after Smucker had informed him of performance concerns on multiple occasions beginning in February 2025.

97.     The PIP clearly identified specific performance deficiencies, measurable objectives, and concrete expectations Defendant was required to meet, including but not limited to:  communicating effectively; utilizing and timely incorporating feedback; collaborating with other teams, and improving leadership skills.

98.     Smucker provided Defendant with resources, supervision, and feedback to assist him in meeting the PIP objectives, including coaching sessions, written feedback, training, and additional oversight.

99.     Despite being given this structured support and ample time to improve, Defendant did not take meaningful steps to address his performance issues. His work significantly worsened while on the PIP.  Defendant continued to communicate in a confusing and unclear manner, failed to move projects forward, submitted deficient work product, and failed to satisfy core job requirements.

100.     Because Defendant was not improving under the PIP requirements, Smucker terminated Defendant's employment on September 18, 2025—at the 60-day mark of the PIP.

### *Defendant's Misappropriation of Smucker's Trade Secrets*

101.    At the time of Defendant's termination, Defendant was in possession of Smucker-owned equipment, including but not limited to three Computer Laptops computers containing Smucker's Confidential Information.

102.    At his exit interview, Smucker expressly instructed Defendant to return all of Smucker's property immediately. Defendant was specifically asked whether he had Confidential and sensitive information with him at the time and whether he had downloaded any Smucker information to USBs. After a brief pause, Defendant stated that he did not.

103.    However, upon his termination, Defendant failed to return the Smucker's Computer Laptops despite repeated written and verbal demands.

104.    Smucker sent multiple communications to Defendant regarding the return of Smucker's property.

105.    On September 18, 2025, Smucker sent a standard reminder letter to Defendant requesting the immediate return of any company property he retained, including Computer Laptops and Confidential Information in accordance with the NDA&I Agreement. A true and accurate copy is attached as Exhibit C.

106.    In October 2025, Smucker's Information Services Team learned that Defendant had forwarded at least 1,955 emails from his Smucker email inbox to his personal email address, dtyvann@yahoo.fr. The @yahoo.fr domain indicates that Defendant's personal account is associated with Yahoo's French domain and may be accessed from a French IP address, suggesting potential cross-border data transfer.

107.    When Defendant failed to comply with his obligation to return his laptops, and after learning that Defendant had forwarded emails from his Smucker email address to his personal one,

Smucker sent a follow-up email and letter via FedEx on October 30, 2025, reiterating the demand and again reminding Defendant of his contractual and legal obligations under the NDA&I Agreement. The letter also requested a certification that Defendant had returned and deleted any Smucker information on his personal devices. A true and accurate copy is attached as Exhibit D.

108.    On or about November 6, 2025, Defendant partially complied with Smucker's demands, by returning two of the three Smucker Computer laptops from the home address where the October 30 and subsequent letters were delivered.

109.    On November 14, 2025, Smucker followed up with Defendant via email, urgently insisting on the return of all Smucker property, requiring the signing of a certification, and restating the consequences of non-compliance.

110.    In the two weeks after receiving the two Computer Laptops from Defendant, Smucker implemented its post-termination protocol regarding its Computer Systems and Laptop and discovered abnormalities. As such, Smucker initiated an investigation into the Computer Laptops that the Defendant had returned and uncovered deeply troubling findings.

111.    Smucker discovered that between September 18, 2025 and October 8, 2025, Defendant accessed Smucker's Computer Systems and Laptops and copied, transferred, or downloaded ***hundreds*** of confidential and proprietary information and sensitive files, using external USB devices.

112.    The files in question that Defendant accessed and copied contained some of Smucker's most closely guarded Confidential Information and trade secrets, including: (1) confidential and proprietary data models related to manufacturing data, which is particular to Uncrustables® branded products; (2) internal PowerPoint presentations on high-priority initiatives concerning Uncrustables® branded products; (3) presentations and documentation describing

confidential technical know-how and diagrams of specialized machinery such as a map of the facility, and (4) other data directly related to Uncrustables® branded products. These include but are not limited to Flow Meter Data, Model Validation Data, Specification Examples such as bread proof height, and Basic Data Systems at Plant. The Confidential Information that Defendant stole would enable scalability of Smucker's products across its SBAs and provide the means to compete directly with Smucker.

113.    On December 17, 2025, Smucker demanded that Defendant returned Smucker's Computer laptop, any other Smucker devices, and any Smucker paper documents, external drives and/or USBs containing Smucker's information and sign a certification that he had done so. A true and accurate copy is attached as Exhibit E.

114.     When Defendant failed to respond, Smucker sent a final notice and demand letter, and again demanded that Defendant sign a certification on January 16, 2025, within three business days, a true and accurate copy thereof is attached as Exhibit F.

115.    On January 21, 2026, an attorney contacted Smucker on Defendant's behalf, that day, Smucker received the final laptop, which remains under investigation.

116.    Between January 21, 2026 and February 4, 2026, through counsel, Defendant impressed upon Smucker that he would return all USBs/external hard drives and other storage media containing Smucker's confidential and proprietary information and trade secrets. Nonetheless, Defendant failed to do so. Instead, Defendant delayed, stalled, and otherwise avoided compliance, while retaining possession, custody, and control of the USBs/external drives and the information contained on them.

117.    On February 5, 2025, Smucker subsequently learned that Defendant's counsel was no longer involved in the matter.

118.    On February 6, 2026, Defendant sent a letter admitting that he continues to retain Smucker's confidential and trade secret information and offering unwarranted excuses for continuing to do so. A true and accurate copy is attached as Exhibit G. Despite that admission, Defendant has taken no meaningful steps to effectuate the return of the USBs/external drives or to certify the destruction of Smucker's confidential and proprietary information and trade secrets.

119.    As of today, Defendant has failed to return any USB devices used to access Smucker's Confidential Information and trade secrets, and any other documents or information belonging to Smucker that he has retained.

120.    Smucker has made good-faith efforts to resolve this matter without court intervention, including repeated requests for compliance and opportunities for voluntary return of its confidential and proprietary information and trade secret from Defendant. Those efforts have been unsuccessful due solely to Defendant's continued delay and refusal to act. -faith efforts to resolve this matter without court intervention, including repeated requests for compliance and opportunities for voluntary return of

121.    As of the filing of this Verified Complaint, Defendant continues to possess Smucker's confidential and proprietary and trade secret information without authorization and in direct contravention of his representations and obligations. As a result, court intervention is necessary to compel the return of Smucker's confidential and proprietary information and trade secret, prevent further misuse or retention of said information, and afford Smucker appropriate relief.

122.    There is an ongoing and serious risk to Smucker's Confidential Information and trade secrets. Defendant's actions are deliberate, willful, and in direct violation of his legal and contractual obligations.

## COUNTS ALLEGED AGAINST DEFENDANT

## COUNT I—MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

123.     Smucker realleges and incorporates by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

124.     Each element of Smucker's Confidential Information, whether considered separately or as a whole, qualifies as a "Trade Secret" under the definition set forth in the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), and Smucker is the rightful owner of these Trade Secrets. Such Trade Secrets includes but is not limited to Flow Data, Model Validation Data, Specification Examples across Smucker's SBAs.

125.     Smucker has invested significant time and resources in the development of its Confidential Information, trade secrets, and other intellectual property, which all relate to the process of manufacturing, producing, and marketing its SBAs.

126.     Smucker has taken measures, reasonable under the circumstances, to maintain the secrecy of its confidential information and trade secrets, including having employees like Defendant, who have access to research and development, sign an NDA&I agreement.

127.     Smucker has marketed and sold its SBAs, i.e., used its Confidential Information and Trade Secrets, in interstate commerce.

128.     Smucker's Confidential Information is generally not known, nor are they readily ascertainable by proper means.

129.     Smucker's Confidential Information derives independent economic value from not being generally known and not being readily ascertainable by proper means.

130.     Defendant misappropriated Smucker's Confidential Information when he accessed Smucker's Computer Systems and Laptop and copied, transferred, and downloaded Smucker's

26

Confidential Information post-termination and has retained such information, which constitutes improper means under 18 U.S.C. § 1839(5) and (6).

131.    Defendant also misappropriated Smucker's Confidential Information when he transferred approximately 1,955 work emails from his Smucker email inbox to his personal email address, which constitutes improper means under 18 U.S.C. § 1839(5) and (6).

132.    The improper means involves, at least, a breach of a contractual duty to Smucker to maintain the secrecy of its Confidential Information under 18 U.S.C. § 1839(6).

133.    The improper means involves misappropriation of Smucker's Confidential Information under 18 U.S.C. § 1839(6).

134.    As a result of Defendant's actions, Smucker has suffered financial harm and is entitled to damages and injunctive relief under 18 U.S.C. § 1836(b)(3)(B).

## COUNT II—MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT, O.R.C. § 1333.61, *et seq.*

135.    Smucker realleges and incorporates by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.    The Confidential Information are "Trade Secrets" within the meaning of the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61. The Confidential Information contain information that has economic value because that information is not generally known to and not readily ascertainable by proper means by others who could obtain economic value from their disclosure or use under O.R.C. § 1333.61(D)(1).

137.    As owner of these trade secrets, Smucker has made reasonable efforts to maintain their secrecy under O.R.C. § 1333.61(D)(2).

138.    Defendant misappropriated Smucker's Confidential Information when he accessed Smucker's Computer Systems and Laptop and copied, transferred, and downloaded Smucker's

27

Confidential Information and has retained such information, which constitutes improper means under O.R.C. § 1333.61(A).

139.    Defendant also misappropriated Smucker's Confidential Information when he transferred approximately 1,955 work emails from his Smucker email inbox to his personal email address, which constitutes improper means under O.R.C. § 1333.61(A).

140.    The improper means involves not only theft but also a breach of a contractual duty to Smucker to maintain the secrecy of its Confidential Information under O.R.C. § 1333.61(A).

141.    As a direct and proximate result of the misappropriation of Smucker's Confidential Information and trade secrets by Defendant's unlawful actions, Smucker is entitled to O.R.C. § 1333.63 to recover from Defendant the actual damages suffered.

## COUNT III—BREACH OF CONTRACT

142.    Smucker realleges and incorporates by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

143.    Smucker and Defendant entered into a valid and enforceable NDA&I Agreement governed by Ohio law. *See* Ex. A.

144.    Defendant accepted his role as a Senior Scientist at Smucker, and as part of his responsibilities, Defendant was given access to Smucker's Confidential Information and trade secrets.

145.    Defendant signed the NDA&I Agreement, in which Defendant acknowledged that he would have access to Smucker's Confidential Information, and he agreed that he would keep Smucker's Confidential Information and trade secrets confidential.

28

146.    Defendant also agreed that upon his departure from Smucker, he would not use Smucker Confidential Information to Smucker's detriment and would return all such Confidential Information.

147.    Defendant expressly agreed, pursuant to the NDA&I Agreement, not to utilize Smucker's Confidential Information and trade secrets in any manner detrimental to Smucker and further to return all such confidential materials and property upon the termination of his employment with Smucker.

148.    Smucker has complied with all of its obligations and conditions precedent under the NDA&I Agreement.

149.    Defendant breached the NDA&I Agreement by deliberately transmitting approximately 1,955 work emails—many containing Smucker's confidential information and trade secrets—to a personal, non-Smucker computer laptop, and retaining these emails despite Smucker's explicit instructions to delete them. In addition, Defendant intentionally retained three Smucker-issued laptops and unlawfully copied, transferred, and downloaded confidential information and trade secrets to external USB drives, in direct violation of the NDA&I Agreement. These actions were willful and in direct contravention of the terms, conditions, and provisions of the NDA&I Agreement.

150.    Defendant's breach of the NDA&I Agreement caused Smucker to suffer damages in excess of $500,000, with the exact amount to be determined at trial.

## COUNT IV—VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA"), 18 U.S.C. § 1030

151.    Smucker realleges and incorporates by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.     Defendant knowingly and intentionally accessed Smucker's protected computer without authorization. Specifically, Defendant retained a company-owned laptop following his resignation.

153.     The retained company laptop constitutes a "protected computer" as defined in 18 U.S.C. § 1030(e)(2), as each is used or affecting interstate commerce or communication.

154.     Defendant's retention of the laptop following his resignation was without authorization and in violation of 18 U.S.C. § 1030(a)(2)(c), which prohibits intentionally accessing a computer without authorization or exceeding authorized access and thereby obtaining information from a protected computer.

155.     As a direct and proximate result of Defendant's actions, Smucker has suffered loss as defined in 18 U.S.C. § 1030(e)(11), including but not limited to costs associated with investigating Defendant's unauthorized access, responding to the breach, restoring access controls, and securing web and Smucker's network systems.

156.     Smucker's loss exceeds $5,000 in value within a one-year period, as required by 18 U.S.C. § 1030(c)(4)(A)(i)(I).

157.     Smucker is entitled to compensatory damages, injunctive relief, and other relief as authorized under 18 U.S.C. § 1030(g).

### COUNT V—UNAUTHORIZED USE OF COMPUTER, CABLE, OR TELECOMMUNICATION PROPERTY, O.R.C. § 2913.04

158.     Smucker realleges and incorporates by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

159.     Defendant knowingly used or operated Smucker's proprietary Computer System and Laptop when he accessed Smucker's confidential and sensitive files and retained Smucker's laptop following his termination without Smucker's consent as defined in O.R.C. § 2913.04(A).

160.    Defendant's actions constitute criminal violations under O.R.C. § 2913.04(B).

161.    As a direct and proximate result, Smucker suffered damages, including costs associated with investigating the breach, restoring affected systems, preventing further access, and addressing related financial harm. Therefore, Smucker is entitled to a civil action for damages under O.R.C. § 2307.60.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Smucker respectfully requests the Court to enter judgment for it and against Defendant as follows:

(1)    Entering a preliminary injunction requiring the return of any external drives containing Smucker's Confidential Information/Trade Secrets and any documents containing or relating to Smucker's Confidential Information/Trade Secrets to prevent further misappropriation of Smucker's Trade Secrets.

(2)    Permanently enjoining Defendant to prevent further misappropriation of Smucker's Trade Secrets.

(3)    Ordering the destruction of any material that was developed with the assistance of, or otherwise incorporates, Smucker's misappropriated Trade Secrets and Confidential Information.

(4)    Entering judgment in favor of Smucker finding that:

a)    Defendant has misappropriated one or more of Smucker's Confidential Information and Trade Secrets in violation of the Defend Trade Secrets Act;

b)    Defendant has misappropriated one or more of Smucker's Confidential Information and Trade Secrets in violation of the Ohio Uniform Trade Secrets Act;

c) Defendant breached one or more provisions of the ND&I Agreement between Defendant and Smucker; and

d) Defendant violated Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and O.R.C. § 2913.04.

(5) Finding that Defendant's conduct was willful and egregious and awarding Smucker exemplary damages under the Defend Trade Secrets Act and the Ohio Uniform Trade Secrets Act.

(6) Finding that Defendant converted Smucker's property by improperly accessing, copying, and transferring, and downloading confidential and proprietary information contained on Smucker's Computer Laptop, which deprived Smucker of its valuable digital assets contained therein, resulting in significant harm to the Smucker's operations, security, and proprietary interests.

(7) Awarding Smucker its actual damages, lost profits, punitive damages, or exemplary damages; loss in value to any Smucker's Trade Secrets, Confidential Information, or other assets that were destroyed or damaged as a result of Defendant's conduct.

(8) Awarding Smucker its reasonable attorneys' fees under the Defend Trade Secrets Act, and the Ohio Uniform Trade Secrets Act.

(9) Awarding Smucker costs, prejudgment interest, and post judgment interest.

(10) Granting Smucker such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Smucker demands a trial by jury on all issues so triable.

Dated: February 12, 2026.

Respectfully submitted,

*/s/ David S. Bloomfield, Jr.*
David S. Bloomfield, Jr. (0068158)
Jhay T. Spottswood-Harrison (0097749)
PORTER WRIGHT MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, OH 43215
Telephone: (614) 227-2000/Fax: (614) 227-2100
E-mail: dbloomfield@porterwright.com
          jspottswoodharrison@porterwright.com

*Attorneys for Plaintiff The J. M. Smucker Company*

## **VERIFICATION**

I, Don Berlin, do hereby verify and declare under penalty of perjury pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that I am the Senior Manager, Information Services of The J.M. Smucker Company ("Smucker"). I have read the foregoing Verification Complaint and know the contents thereof and state that the allegations contained in Paragraphs 1, 7-11, 67-76 (with respect to Computer Systems), 101, 103-104, 106-112, 119-122, and 151-161, are true and correct to the best of my knowledge. As to the remaining paragraphs, I make no representations. I base this verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, I believe them to be true.

Executed on the 11th day of February, 2026.

*Don Berlin*
Don Berlin (Feb 11, 2026 11:22:35 EST)

Don Berlin

35

## VERIFICATION

I, Alison Ledsome do hereby verify and declare under penalty of perjury pursuant to the laws of the United States of America, 28 U.S.C. § 1746, that I am the Manager, Consumer Foods Research & Development, Process Engineering of The J.M. Smucker Company ("Smucker"). I have read the foregoing Verification Complaint and know the contents thereof and state that the allegations contained in Paragraphs 2-6, 12-66, 67-76 (with respect to Research & Development), 77-82, 88-100, 102, 107-109, and 123-150 are true and correct to the best of my knowledge. As to the remaining paragraphs, I make no representations. I base this verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, I believe them to be true.

Executed on the 11 day of February, 2026.

_Alison Ledsome_
Alison Ledsome

34